**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
PALM BEACH DIVISION**

| | |
|---|---|
| CGP CANADIAN, LTD; GGSK TULIA, LTD; CGP SEYMOUR, LTD.; CGP OROFINO, LLC; CGP COMANCHE, LTD; CGP JACKSBORO, LTD; CGP COTULLA, LTD; CGP PROSSER, LLC; CGP CLIFTON, LTD, | ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) | CIVIL ACTION NO.: 9:19-cv-80602-DMM |
| SUN CAPITAL PARTNERS GROUP, INC.; SUN CAPITAL PARTNERS, IV, LP, SUN CAPITAL MANAGEMENT, LLC LLC AND KLA-SHOPKO, LLC, | ) ) ) ) ) |
| Defendants. | ) |

**FIRST AMENDED COMPLAINT**

Plaintiffs state the following as its Complaint against Sun Capital Partners Group, Inc.

Sun Capital Partners, IV, LP (collectively "Sun Capital"); Sun Capital Management, IV, LP

("Sun Capital Management"); and KLA-ShopKo-LLC ("KLA").

**I.   JURISDICTION AND VENUE**

1.      Jurisdiction is proper under 42. U.S.C. §1331 Federal Question Jurisdiction.  This

case arises under The Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C.

§1962, et seq.

2.      Venue is proper in this District and Division pursuant to 42 U.S.C. § 1391.  This

is a district in which a substantial part of the events or omissions giving rise to the claims

occurred.

1

## II.    PARTIES

3.      Plaintiff CGP Canadian, Ltd., is a Texas limited partnership formed to develop a ShopKo property in Canadian, Texas.

4.      Plaintiff CGSA Tulia, Ltd., is a Texas limited partnership formed to develop a ShopKo property in Tulia, Texas.

5.      Plaintiff CGP Seymour, Ltd., is a Texas limited partnership formed to develop a ShopKo property in Seymour, Texas.

6.      Plaintiff CGP Orofino, LLC., is a Delaware limited liability company formed to develop ShopKo property in Orofino, Idaho.

7.      Plaintiff CGP Comanche, Ltd., is a Texas limited partnership formed to develop a ShopKo property in Comanche, Texas.

8.      Plaintiff CGP Jacksboro, Ltd., is a Texas limited partnership formed to develop a ShopKo property in Jacksboro, Texas.

9.      Plaintiff CGP Cotulla, Ltd., is a Texas limited partnership formed to develop a ShopKo property in Cotulla, Texas.

10.      Plaintiff CGP Prosser, LLC, is a Delaware limited liability company formed to develop a ShopKo property in Prosser, Washington.

11.      Plaintiff CGP Clifton, Ltd., is a Texas limited partnership formed to develop ShopKo property in Clifton, Texas.

12.      When any Plaintiff is referred to herein, each Plaintiff is to be included jointly, separately, and severally, as if each Plaintiff were referenced.

13.      Defendant Sun Capital Partners Group, Inc., is a Delaware corporation with its principal place of business in Boca Raton, Florida.  Sun Capital Partners Group, Inc. and Sun

Capital Partners IV, LP, are referred to herein collectively as "Sun Capital."  Both are affiliated companies that are private investment entities that invest in holding companies that in turn own operating companies known as "portfolio companies."

14.     Defendant Sun Capital Partners, IV, LP ("Sun Capital") is a limited partnership organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida.  Sun Capital is a private investment partnership that invests in holding companies that in turn own operating entities known as "portfolio" companies.

15.     Defendant KLA-ShopKo, LLC is a Delaware limited liability company created in January 2016 by Sun Capital.

16.     Defendant Sun Capital Management IV, LP ("Sun Capital Management"), is a Delaware Limited Partnership created to manage ShopKo and ShopKo Operating Company, LLC ("ShopKo OPCO") after ShopKo was acquired by Sun Capital.


## III.     FACTS

### A.     The ShopKo Acquisition.

17.     In December 2005, Sun Capital acquired, in a merger transaction, all of the stock of the then publicly traded company called ShopKo Stores, Inc. ("ShopKo").

18.     The merger was a typical acquisition for Sun Capital.  Sun Capital created an entity called SKO Group Holding Corp. ("SKO Holding") shortly before the transaction, and another entity called SKO Acquisition Corp. ("SKO Acquisition").  Those entities were merged with ShopKo, with the surviving entity being ShopKo.

19.     The merger called for the conversion of each existing share of ShopKo stock into the right to receive $29.00 in cash, for a total purchase price of approximately $877,000,000.

20.     The intended effect of this transaction was to transform ShopKo from a publicly traded company to a wholly-owned "portfolio company" of Sun Capital.

21.     Although Sun Capital now completely owned Shopko, Sun Capital did not provide 90% of the capital for the ShopKo transaction.[1]  Instead, it required ShopKo to pay for its own acquisition.  Sun Capital did so by borrowing the money from two separate sources:  (1) a $600,000,000 line of credit secured by all of ShopKo's assets, except its real estate; and (2) a real estate loan of another $600,000,000, secured by the ShopKo owned real estate. ShopKo borrowed $1,200,000,000 to finance a $877,000,000 acquisition.

22.     The entity saddled with the debt was ShopKo, not Sun Capital.  This is the first layer of new debt to a company that theretofore had continued to grow while carrying only the debt necessary for its growth and operation.  Indeed, according to the public filings for the merger, ShopKo's total debt on October 29, 2005, just over a month before the merger, was only $302,000,000.

23.     The leveraged buyout of ShopKo changed its financial and operational picture immediately.  Instead of a publicly owned company subject to SEC reporting requirements, ShopKo became a privately held, wholly-owned subsidiary of SKO Holdings, which is owned by an affiliate of Sun Capital.

**B.     The Looting of ShopKo.**

24.     Sun Capital effectively began to operate ShopKo as its own bank account, for its benefit, with the ultimate (and secret) plan to bankrupt ShopKo after stripping it of all its assets.

25.     In addition to saddling ShopKo with debt from its own acquisition, ShopKo was also paying Sun Capital and its affiliates millions of dollars in special dividends and fees that the

---

[1] Sun Capital did contribute some capital, but less than 10% of the total acquisition price.

company could not afford if it were to remain a viable going concern.  Beginning in 2006, or thereabouts, ShopKo paid to Sun Capital and its affiliates over $117,000.000 in special dividends, fees, and other payments, including, $50,000,000 in distributions to Sun Capital and its affiliates over the last four (4) years.

26.     Sun Capital was able to effectuate its scheme by installing its own management team for ShopKo.  In 2005 or 2006, SKO Holdings, a Sun Capital created party, entered into a ten-year management agreement with yet another affiliate of Sun Capital Management.

27.     This agreement farmed out ShopKo management decisions to an entity belonging Sun Capital, and did so for a fee that would take even more money from ShopKo operations, and send it to Sun Capital.  According to SEC filings by Spirit Finance Corporation ("Spirit"): (1) SKO Holdings, agreed to pay Sun Capital Management an annual fee of $3,000,000, plus out-of-pocket expenses for "financial management consulting services."

28.     Sun Capital Management received more funds from the sale of ShopKo's entire real estate portfolio in May of 2006.  In addition to the aforementioned management fees, the agreement with Sun Capital Management called for it to be paid "1% of the aggregate consideration paid to or by the Company in connection with such work."

29.     Such an event occurred shortly after the ten (10) year management agreement was signed.  As explained below, SKO Holding, at the direction of Sun Capital,  sold all former ShopKo real estate assets.  A total of $5,700,000 was paid to Sun Capital Management, or two other Sun Capital affiliated companies.

30.     In addition to the real estate specific fees referenced above, in 2005, in connection with the "acquisition and related financing," Shopko paid another $17,100,000 in fees to Sun Capital Management and affiliates.  That is $22,800,000 paid out of ShopKo assets to Sun Capital

and its affiliates as "fees" for its own acquisition, and for the shedding of the primary assets, in addition to the $3,000,000 yearly management fee.

### 1.   Sun Capital Sheds ShopKo's Primary Asset.

31.   The largest ShopKo asset at the time of Sun Capital's acquisition was the real estate. Almost immediately after the acquisition, however, the Sun Capital management team shed this asset.

32.   In May of 2006, SKO Holdings Group, LLC, which then had title to the assets, sold the real estate to Spirit Finance Corporation ("Spirit"), for $815,300,000.

33.   Spirit acquired the real estate assets by purchasing 100% of the outstanding stock of ShopKo Stores, Inc., which SKO Group Holding Corp. owned at the time.  As part of the transaction, another affiliate of Sun Capital, Sun Capital Operating Company, LLC ("ShopKo OPCO"), which actually operated the retail outlets, entered into long-term, triple-net lease agreements with affiliates of SKO.

34.   The net effect of this transaction was that Sun Capital received the sales price of $815,300,000 for the only real assets of the company it had just purchased with borrowed money. The operational arm of ShopKo then entered into a lease agreement to lease the very properties previously owned by SKO Holding Corp., which were previously owned by ShopKo, Inc.  Thus, the value of the real estate was stripped from the company, leaving in its place lease obligations for ShopKo OPCO.

35.   The debt crisis created for SKO Holding Group Corp. is outlined in stark terms in the SEC filings of Spirit, laying out the assets and liabilities of SKO Holding Corp. before and after the real estate transaction.

### ASSETS

|  | April 29, 2006 | May 5, 2007 |
|---|---|---|
| Property & Equipment | $747,502,000.00 | $30,039,000.00 |
| Intangible Assets | 29,605,000.00 | 637,000.00 |
| Total Assets | $777,107,000.00 | $30,676.000.00 |

36.     It would appear on paper that the transaction unburdened SKO Holding of substantial liabilities.    However, in truth, it did not.  Spirit paid SKO Holding for the acquisition of ShopKo stock.   The obligator on the leases and debt is ShopKo Operating Co., LLC.  This piece of business netted $81,500.000 to SKO Holding, and saddled ShopKo Operating Company with leases that it was ill-situated to pay.

### 2.     Sun Capital Drains More From the Real Estate Assets.

37.     The above-referenced scheme resulted in the looting of ShopKo's assets, and the fruits of that liquidation flowed to Sun Capital.   However, Sun Capital was not satisfied with looting ShopKo's existing assets, it would go on to create new real estate assets, and by a system of fraud, drain even more capital out of brick and mortar retail outlets at the direction of Sun Capital.

38.     From the moment the sale-leaseback transaction was announced, ShopKo OPCO began to misinform members in the real estate business as to its intentions.   SKO Holding was paying exorbitant fees, and transferring capital out of ShopKo Operations and into the hands of Sun Capital.   The President and Chief Merchandising Officer of ShopKo OPCO acknowledged that the sale-leaseback transaction had disposed of "substantially all of our real estate in one event, we eliminated the management burden that multiple real estate dispositions would require,

allowing our management teams to focus on continuing to improve operations, growing our store base, and delivering value to our loyal customers."

39.     The problem with this statement is that it comes in the wake of the payment of millions of dollars in management fees tied specifically to the value of real estate transactions.  In addition, and to create even more transactional costs for the benefit of Sun Capital, Sun Capital created KLA-ShopKo, LLC ("KLA").

40.     KLA was created in January of 2006 to provide "advisory and other services to the Company in relation to the Company's real estate assets.  KLA was entitled by contract with SKO Holding Corp., to be paid $1,200,000, plus out-of-pocket expenses over one year for advisory services relating to ShopKo real estate assets; .5% of the gross sales price of such assets; and .25% of gross financing of the sale of those real estate assets, up to $700,000, plus .75% of any overage. As the result of the sale-leaseback transaction, SKO Holding Corp., paid KLA $4,400,000.

> ### C.     ShopKo OPCO, at the Direction of Sun Capital, Defrauds CGB and Others Similarly Situated.

41.     While Sun Capital was effectuating its scheme to drain the – mostly real estate – assets from SKO Holding, SKO Holding, through ShopKo OPCO, began a process to further use a company destined to fail in order to convert real estate investment capital into more money for Sun Capital.

42.     As the ten-year management agreement with Sun Capital Management wound down, Sun Capital and Sun Capital Management devised a new scheme to further use ShopKo as a conduit for passing money to Sun Capital that was supposed to be used for its operations.  There was a general plan for Sun Capital to profit from ShopKo's real estate portfolio and leave creditors holding the bag.  There was also a very specific plan to defraud real estate developers. The specific plan was to defraud Plaintiffs and others into believing that they were investing capital into real

estate ventures for ShopKo locations, when what they were really doing was sending payments to Sun Capital, with little or no chance to recover their investment.

43.     In 2013, or 2014, ShopKo began an aggressive expansion campaign.  The stated goal of this campaign was to build more stores in rural areas branded "ShopKo Hometown," that would include pharmacies and other retail items in underserved, smaller town, retail markets.

44.     In reality, the "ShopKo Hometown" program was a way to add assets that would never be paid for, and to funnel cash payments from real estate developers like Plaintiffs to Sun Capital.

45.     This plan was not hatched by ShopKo, it was hatched by Sun Capital.

46.     The plan to defraud Plaintiffs operated "top down".  That is, Sun Capital Management instructed ShopKo's real estate division employees to find real estate developers to develop sites that it knew would never be profitable, and to extract from real estate developers like Plaintiffs what are known as Tenant Improvement ("TI") payments.

47.     As explained below, there was no intent to use the TI payments as represented, but the plan was to extract the monies from real estate developers like Plaintiffs, and send that money directly to Sun Capital.

48.     Sun Capital's domination of the real estate division of ShopKo was so complete that ShopKo operated as the mere agent of Sun Capital.  Any statements from Mr. Kucharski to Plaintiffs came upon instruction from Sun Capital Management.

49.     Indeed, the domination of ShopKo by Sun Capital was so complete that in March of 2016, ShopKo CEO and President Peter McMahon stated that he "actually work[s] for a company called Sun Capital."  See htps://www.youtube.com/watch?v=Ahs4XnRsjy0.  He was certainly operating ShopKo at the time, for the benefit of Sun Capital.  To this day, Peter

McMahan's LinkedIn account provides that he reported to the "joint owners of Sun Capital Partners," He does not indicate that he reported to the owners of ShopKo. See https://www.linkedin.com/in/peter-mcmahon-4917a61b/?originalSubdomain=uk.

50.     In late 2014, Hugo Isom, Robert Buchalter, and upper management of Plaintiffs met with Joe Kucharski, who worked for the real estate arm of ShopKo OPCO in Las Vegas, Nevada.  The parties began discussions that would eventually lead to the development of "ShopKo Hometown" sites by Plaintiffs under the ShopKo "build to suit" program.

51.     Under the plan, Plaintiffs were to acquire land and develop retail locations for ShopKo OPCO.  The basic structure of the program was that real estate developers like Plaintiffs would acquire property and build a ShopKo Hometown retail location "to suit" ShopKo.  Then ShopKo would enter a lease for the location with Plaintiffs, who would then hold the property and collect rents to recover its investment, or sell the property, subject to the lease.

52.     Negotiations, of course, centered on costs and exactly what would be included in the retail location provided to ShopKo OPCO.

53.     The leases that were ultimately agreed to contain an agreed upon site plan, including acreage, parking, building floor area and other improvements, to be leased at an agreed upon monthly rate, for an agreed upon term.

54.     Plaintiffs, being experienced in the commercial real estate business, understood that their ability to either remain as landlords to the property, and recoup their investment, over time, or sell the property subject to the lease, was dependent upon a solvent and viable tenant for the property.  Real estate investments are typically made to achieve a certain target number known as the capitalization rate, or "cap rate."  In the present context, the cap rate is a rental rate divided by the total cost to develop the property.  For example, if a real estate developer builds a site for

$1,000,000, and has a lease for $100,000, the cap rate is .10, 04 10%. If, however, due to questions concerning the ability of the tenant to pay rent, the real estate developer is only able to sell the property for $900,000, the cap rate becomes .10, or 11%, which indicates a diminished return on the property. Conversely, if the developer sells the property for $1,200,000, the cap rate goes down to .83, or 8.3%. A lower cap rate is better in such a sale.

55.     Ostensibly, the Tenant Improvement allowance was to help ensure the viability of the retail tenant. ShopKo OPCO personnel, from the very beginning of negotiations with Plaintiffs were particularly focused on the Tenant Improvement allowance component of the lease. In fact, either at that first meeting, or shortly thereafter in a phone conversation, Mr. Kucharski told Plaintiffs' upper management, including Mr. Isom, to be prepared for a $500,000 Tenant Improvement payment to be part of any package, and if that were going to be "too expensive or too problematic," that they would not be able to reach an agreement. Mr. Kucharski said that ShopKo was going to spend $1,200,000 on the store, and that $500,000 of that would be the Tenant Improvement money provided by Plaintiffs and the developers.

56.     Mr. Kucharski told this to Plaintiffs at the specific direction of Sun Capital Management.

57.     Indeed, Mr. Kucharski, in soliciting Plaintiffs to develop retail locations, knew the ShopKo stores would not be profitable. He knew this because he and the ShopKo real estate team had done the market research concerning what markets would support ShopKo Hometown stores. When Sun Capital was told that ShopKo was being asked to develop stores for more markets than were viable, Mr. Kucharski was told that it did not matter, that the scheme was to extract the monies (and to make ShopKo a more attractive public offering), and that he needed to develop sites whether they would ultimately be successful or not.

58.     In fact, on July 13, 2016, Peter McMahon told Robert Buchalter of Capital Growth that "Texas was critical" to the success of the business,"  and that he wanted Plaintiffs to develop 100 stores in Texas.  He stated this, at the direction of Sun Capital, and as a stated employee of Sun Capital, despite knowledge that Plaintiffs would rely on the statement to develop Texas stores, but that there stores would never be profitable, and were just a conduit to extract the TI payments from Plaintiff to Sun Capital.

59.     The Tenant Improvement allowance was ultimately contained in form leases entered into by Plaintiffs.  The specific language is, "On or before the date which is ten (10) days after Tenant opens the Premises to the public for business, Landlord shall pay X dollars to Tenant as an allowance, to be used by Tenant for maintenance, repairs, fixtures, and alterations to the Premises."

60.     As a general rule, Plaintiffs understood the concept behind Tenant Improvement payments, but did push back during the negotiations.  When the subject would come up, ShopKo OPCO personnel, at the direction of Sun Capital, would explain how the Tenant Improvement monies would be a good investment based on the ultimate plan for ShopKo.

61.     There were many conversations over the telephone between Mr. Isom and the Plaintiffs' upper management personnel, and Mr. Kucharski on the ShopKo OPCO side from late 2014 through late summer 2015, about that overall plan for ShopKo.

62.     When Tenant Improvement payments were discussed, Mr. Kucharski, at the direction from Sun Capital, would justify them within the overall plans for ShopKo.  Mr. Kucharski, at the ultimate direction from Sun Capital, would say that the Tenant Improvement funds would ensure that the ShopKo Hometown growth plan would be in full swing for a planned

public offering of ShopKo.  He told Plaintiffs that the plan was to take the company public, and that then the value of the leases, and hence the value of Plaintiffs' investment, would skyrocket.

63.     In addition, it was represented to Plaintiffs that the TI monies would be used to support pharmacies in the ShopKo Hometown stores, assist in the start-up costs with pharmacies, provide ongoing computer support and advertising for the stores.  However, none of that happened even though Plaintiff constructed pharmacies pursuant to detailed construction plans and specifications.  Instead, Plaintiffs got bare bones stores that were destined to fail

64.     More specifically, the TI payments were supposed to be used to support pharmacies in the ShopKo Hometown stores.  Plaintiffs relied upon these representations in building out pharmacies, at their expense.  However, pharmacies were not put in the stores, except for the Orofino, ID store.  Plaintiffs would not have built out pharmacies if they had known that there would be no TI support for the pharmacies, and indeed they never would be opened.

65.     The representations came straight from the top.  Mr. McMahon, who was directed by Donald Roach at Sun Capital, whose portfolio included ShopKo, and acting as its agent, told Mr. Kucharski.

66.     To demonstrate how important the representations regarding the operation of pharmacies, the Orofino, ID store, which operated a pharmacy store, had sales that were, on average, four times the sales for the remained of the stores that did not have an operating pharmacy.

67.     Mr. Kucharski even pointed out, at the ultimate direction of Sun Capital, that ShopKo had retained new consultants and tax advisors, Price Waterhouse Cooper ("PWC") and that "you do not do that unless you are going to take the company public."  Mr. Kucharski also told Plaintiffs that the investment firm Goldman Sachs "was already lined up for an IPO."  These

statements were made many times to convince Plaintiffs that the Tenant Improvement monies were good investments.

68.    Mr. Kucharski made these statements on many occasions, but specifically on telephone calls on November 5, 2014, May 18, 2015, and August 18, 2015.

69.    While inclusion of the Tenant Improvement payments makes the project less attractive initially, Plaintiffs were willing to make this capital investment to ensure that there would be a stable tenant, and to be able to be part of the plans going forward that Mr. Kucharski had informed them of.

70.    However, ShopKo Operating did not use the Tenant Improvement monies for the purposes represented in the leases.  Instead, these monies were funneled directly to Sun Capital.

71.    The Tenant Improvement monies were a lot higher than Plaintiffs were accustomed to paying, but they were willing to pay them based on:  (1) the specific assurances that the monies would be spent to further tenant stability, including the operation of pharmacies and (2) to be part of an overall plan to position ShopKo for an Initial Public Offering, thus increasing the value of the leases.

72.    The "build to suit" program was aggressively marketed to commercial real estate entities like Plaintiffs.  Offering memoranda were distributed touting the fifty (50) new ShopKo stores opened in 2015, as part of its new ShopKo Hometown format.

73.    The truth of the matter was that, as ShopKo Operating Company was aggressively looking to develop new stores, Sun Capital was unconcerned with whether those stores would ever become profitable or stay in business.  Sun Capital was unconcerned because it was: (1) using developer money to build its new locations and would leave them holding the bag when it

bankrupted ShopKo; and (2) profiting immediately by sweeping the Tenant Improvement payments into Sun Capital as opposed to spending those funds as indicated in the lease.

74.     ShopKo personnel stated via printed memoranda, as late as 2015 that, "ShopKo plans to rapidly expand their newer ShopKo Hometown brand over the next two years without adjusting their current locations."

75.     These representations caused CBG to enter into nine (9) "build to suit" locations for ShopKo.  Those locations and the dates of the leases are as follows:

|   |   |
|---|---|
| i. | Prosser, Washington:  January, 2015 |
| ii. | Orofino, Idaho:  August, 2015 |
| iii. | Canada, Texas:  August, 2015 |
| iv. | Comanche, Texas:  October, 2015 |
| v. | Cotulla, Texas:  November, 2015 |
| vi. | Jacksboro, Texas: January, 2016 |
| vii. | Clifton, Texas:  February, 2016 |
| viii. | Seymour, Texas:  March, 2016 |
| ix. | Tulia, Texas:  March, 2016 |

76.     Plaintiffs paid almost $4,000,000 in the aggregate in Tenant Improvement payments.

77.     Plaintiffs were able to sell the Prosser, Washington, and Cotulla, Texas location for cap rates of 7% and 7.4%, which is within acceptable parameters for such a project.  However, the remainder of the properties either:  (a) remain in their hands, with no real ability to sell due to the ShopKo bankruptcy, and (b) no ability to recoup their investment as ShopKo prepares to shutter its stores through the bankruptcy.

78.     A large part of the reason these properties are worth less than they would have been had the TI monies been spent as represented, whether ShopKo continued in existence or not, is because they do not have pharmacies, which should have been provided with the TI monies.  Defendants admitted to Plaintiffs that that did not spend the TI monies on Plaintiff's stores.

79.     Unbeknownst to Plaintiffs, ShopKo was being positioned for bankruptcy at the time it was developing ShopKo sites.  Dividends, financed through cash on hand that should have been used to legitimately operate and grow the business, through borrowing from the company's credit facilities; and financed by the Tenant Improvement payments that should have been used as represented, were paid from ShopKo Holding and ShopKo Operating Company to Sun Capital.

80.     It was not until July of 2016, when Plaintiffs were contacted by one of ShopKo Holding's consultants with a threat that the company would file bankruptcy, and a demand for rent reductions, that Plaintiffs had an inkling of Sun Capital's actual plan.

81.     Once word of ShopKo's financial position had gotten around, Plaintiffs' ability to sell developed properties was negatively affected.  It sold the Clifton, Texas property at an 8.03 capitalization rate, and the Comanche, Texas property at an 8.70 capitalization rate.  The capitalization rates were rising because the commercial real estate community was becoming aware of ShopKo's bankruptcy threats.

82.     A year later, in October, 2018, with negotiations to find a purchaser for ShopKo reported in the financial press, and rumors about bankruptcy swirling, Plaintiffs were able to sell the Jacksboro, Texas property, but only at a 10.67 capitalization rate.

83.     The penultimate act of the scheme orchestrated by Sun Capital came with the ShopKo bankruptcy filing on January 9, 2019.

84.     ShopKo stood at that point, according to its bankruptcy filing, with assets of less than $50,000, and liabilities of over $500,000,000.

### C.     The ShopKo Scheme Continued a Pattern of Sun Capital Activity.

85.     The pillaging of ShopKo's assets, followed by a bankruptcy filing, is part of a Sun Capital pattern.

86.     Sun Capital's scheme to acquire and drain ShopKo's assets, followed by the filing of the Bankruptcy Petition, is not a new plan for Sun Capital.  In fact, Sun Capital pursued this same strategy for brick and mortar retailers Gordman's stores, Marsh Supermarkets, The Limited Stores, and others.

        1.     **Gordman's Stores.**

87.     In 2008, Sun Capital acquired Gordman's Stores, a retail department store chain of sixty-five (65) stores, located largely in the Midwest.  The purchase price leveraged by Sun Capital is believed to have been approximately $100,000,000.

88.     In 2010, an Initial Public Offering of Gordman's stock was made, and the shares were priced at approximately $14.00.  The Initial Public Offering was not well received, and the share price was reduced to $11.00.  The IPO netted Sun Capital $54,000,000, but nothing for the now publicly traded corporation.

89.     In 2013, Sun Capital forced a $70,000,000 special dividend from Gordman's operating entity to it, bringing the total amount paid to Sun Capital through Gordman's to $140,000,000, of which $45,000,000 was borrowed money, and the remaining amount was from the public through the offering.  This is in addition to fees and other transactional costs it extracted from Gordman's relating to its original leveraged buyout.

90.     Predictably, the company could not shoulder its debt and filed bankruptcy in March of 2017.  In just nine (9) years, Sun Capital had taken a retailer that had been in existence for almost ninety (90) years, extracted over $140,000.000 from it and the public, and put it into Chapter 11 Bankruptcy.  Gordman's shareholders and creditors were left holding the bag.

2.      **Marsh Supermarkets.**

91.     At approximately the same time that Sun Capital was taking Gordman's through bankruptcy, it was dismantling Marsh Supermarkets, LLC.

92.     Prior to its acquisition by Sun Capital in 2006, Marsh Supermarkets operated a chain of over 260 supermarkets and convenience stores.

93.     Just as it did with ShopKo, Sun Capital acquired Marsh Supermarkets in a leveraged buyout.

94.     The first order of business was to sell the most valuable assets of the acquisition, the real estate, and then the stores themselves.

95.     Not only did Sun Capital, through its sale of real estate, and a leaseback program, take the value of the real estate, and transfer it to Sun Capital, but it failed to meet its obligation to fund ERISA pension plans, as required by law, for the Marsh Supermarket store employees.

96.     In a move in furtherance of its scheme to strip capital out of acquired companies, Sun Capital represented to another target acquisition that it would use proceeds from a multimillion-dollar judgment, and the sale of another affiliate, to meet its Marsh pension obligation.

97.     Marsh Supermarkets did not make the contributions to the pension fund that it represented.  Instead, it took the approximately $56,000,000 in judgment and sale proceeds, and distributed it to Sun Capital in the form of a dividend.

98.     This left Marsh Supermarkets with unreasonably small assets in relation to their then existing liabilities, including its pension obligations.

99.     The next stop, of course, was the filing of a Chapter 11 Bankruptcy Petition in May of 2017, through which the company was liquidated.

### 3.    The Limited Stores.

100.    Sun Capital acquired a brick and mortar retailer of mostly women's clothes called The Limited in 2007.

101.    The Limited was founded in 1963, and had grown to six stores when it was taken public in 1969.  By 1976, successor Limited Brands, Inc. had grown to over 100 stores, acquiring other brands and stores to continue its growth through the 1990s and into the 2000s.

102.    Beginning in the early 1990s, however, many Limited stores and brands, "The Limited," began to take on losses.

103.    In a now familiar strategy, Sun Capital created a new entity that it would eventually bankrupt to acquire The Limited.  The twist this time was that Sun Capital gave up 75% of its interest in The Limited without receiving any cash in exchange.  What it did was report the $72,000,000 loss from the sinking ship that was The Limited to six newly created Sun Capital entities.

104.    After Sun Capital acquired 100% of the holding company, Sun Capital installed, through another affiliate, its own management team.  Its managers caused Limited Stores to enter into a term loan agreement, draw down that term loan, and then make a "special" distribution from The Limited Stores to Sun Capital consisting of money borrowed by The Limited Stores, any available cash, and more monies borrowed from its revolving line of credit.  The distribution amount was approximately $50,000,000.  This saddled The Limited Brands with debilitating debt, which eventually led to its bankruptcy filing in 2017, but not before The Limited Stores had paid management fees to the Sun Capital affiliated "management team" that was running it into the ground.

105.   These are just three examples of the basic pattern of activity Sun Capital has pursued for years:  (1) acquire a brick and mortar retailer in a highly leveraged transaction; (2) strip the retailer of its assets, leaving it unable to operate; and (3) take the retailer through bankruptcy.

**D.**   **Sun Capital's Actions Constitute a Pattern of Racketeering Activity.**

106.   The common thread of Sun Capital's actions in general is: (1) acquisition of a target company through a leverage buyout, costing Sun Capital no money; (2) saddling the acquired company with the debt from its own acquisition; (3) installation of a Sun Capital controlled management team; (4) further borrowing; (5) distributions from the acquired target to Sun Capital; leading to (6) a bankruptcy filing.  While the vehicles through which this was accomplished do vary, the same template is used.

107.   In specifics, as it affects those particular Plaintiffs, Sun Capital's actions resulted in a pattern of predicate acts prohibited by RICO 18 U.S.C. § 1961; namely fraudulent statements transmitted through the mail and wires, in violation of 18 U.S.C. §§ 1341 and 1343 that those Tenant Improvement funds would be used to capitalize the ShopKo Hometown stores Plaintiffs developed.

## COUNT I
### (Violations of RICO 18 U.S.C. § 1961(c),
### Against all Defendants)

108.   Plaintiffs incorporate by reference, as if set forth fully herein, paragraphs 1 through 107 above.

109.   At all relevant times, Defendants were persons within the meaning of 18 U.S.C. §§ 1969(3) and 1962(c).  In addition, unnamed parties ShopKo Holding and ShopKo OPCO operated as persons who were part of the RICO enterprise described above.

110.    At all relevant times, each RICO defendant, and unnamed ShopKo entities, were persons discreet from the RICO enterprise described below.

A.    **The RICO Enterprise.**

111.    Defendants Sun Capital, KLA-ShopKo, LLC, ShopKo Management and unnamed parties ShopKo Holding and ShopKo OPCO, constitute an association in fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962 (c), referred to herein as The Enterprise.

112.    The Enterprise had the common interest of stripping ShopKo of assets, and sending them to Sun Capital.  The Enterprise engaged in a multi-year campaign to extract capital from ShopKo and any company doing business with ShopKo.  This scheme was planned as early as 2006, but did not ensnare Plaintiffs until it participated in the "build to suit" program for ShopKo Hometown stores beginning in 2014.

113.    The Enterprise had business relationships rooted in common ownership, control, and business arrangements, and a mutual goal in causing the distribution of capital out of ShopKo and into the hands of Sun Capital and its affiliates by repeatedly enticing those doing business with ShopKo to transfer capital to ShopKo, so that it could then, through dividend distributions, or other management and transfer fees, distribute that capital to Sun Capital and its affiliates.

114.    The Enterprise organized itself with Sun Capital, ShopKo Management, and KLA directing the activities of ShopKo Holding; and ShopKo OPCO with the sole goal in mind to drain ShopKo of its assets, and then to purge the debts accumulated, leaving those who did business with ShopKo, and relied on its representations, holding the bag, or having paid for severely devalued assets.

115.    Each participant in the Enterprise played a particular, discreet role in extracting monies from Plaintiffs that ultimately wound up in the hands of Sun Capital.

116.     ShopKo OPCO, while directed by Sun Capital and its affiliates, was ostensibly engaged in the legitimate business of running a retail department store, and developing properties.

117.     However, it took its orders from ShopKo Holding, which was so dominated by Sun Capital that it was the mere agent of Sun Capital, to make the representations it did to Plaintiffs concerning Tenant Improvement monies, regardless of the effect on the company or real estate developers like Plaintiffs.

118.     Sun Capital could not have carried out the Enterprise of getting monies from real estate developers, and to have them develop real estate it knew would soon be worth pennies on the dollar, without the presence and artifice of ShopKo OPCO, Sun Capital Management, and KLA-ShopKo.  They were discreet persons, each with their own role to play.

119.     The representations of Defendants regarding the Tenant Improvement funds, and the subsequent failure to use those funds as represented, are discrete criminal acts.   While these acts rely upon particular conduct, they were undertaken within the framework of the overall scheme to use ShopKo as a conduit to direct cash to Sun Capital and its affiliates, and leave no recourse for those who were duped by the scheme.

120.     Each RICO Defendant knew of the existence of, and conducted, as stated herein, the affairs of the Enterprise.

121.     At all relevant times, the activities of the Enterprise affected interstate commerce within the meaning of 18 U.S.C. § 1962(c).  The affairs of the Enterprise were directed by Sun Capital from its headquarters in Boca Raton, Florida, but the real estate developments were scattered throughout the United States.

### B.  Participation in the Affairs of the Enterprise.

122.     As noted above, each Defendant participates in the conduct of the Enterprise.

123.    Sun Capital directed Sun Capital Management, KLA-ShopKo, and the unnamed ShopKo conspirators to make the misrepresentations referenced above.  Without each person involved in the Enterprise, the representations that led to Plaintiffs' ill-fated investment would not have been possible.  They each played a role in carrying out the scheme to have Plaintiffs develop ultimately retail properties, that are now of limited value, and pay Tenant Improvement monies that went directly to Sun Capital.

### C.  The Pattern of Racketeering Activity.

124.    Plaintiffs entered into nine (9) leases with ShopKo OPCO in 2015 and 2016.  Each one of those leases included the section relating to the Tenant Improvement payments, which were untrue.  Each one of those representations was transmitted through the mails and wires, and each one was relied upon by Plaintiffs, in making the Tenant Improvement payments, and entering into the leases.

125.    In conjunction with those representations, ShopKo, at the direction of Sun Capital, and through its management arm, Sun Capital Management sent the Tenant Improvement monies to Sun Capital in an act particularly aimed at avoiding the bankruptcy it knew was on the way.  It wrongfully diverted those funds each time they were paid in a similar, if not identical, fashion, between 2015 and 2016.

126.    These actions constitute an operation of the Enterprise affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1341 and 1343, wire and mail fraud.

127.    These related acts extended over a period of time beginning in 2015, and extending through 2016.  The ShopKo bankruptcy, a key component of the scheme, is currently pending.

128.    In more specific terms, this pattern violated 18 U.S.C. §1343, which states that, "whoever, having devised or intended to devise any scheme or article to defraud, or for obtaining

money or property by means of false or fraudulent pretenses, representations, or promises, or causes to be transmitted by means of wire . . . communication in interstate or foreign commerce, any writings for the purpose of executing such scheme or article . . . shall be guilty of wire fraud." Sun Capital directed and knew that these false representations would be made to Plaintiffs through the wires and mails,  As such, it is guilty of a conspiracy to commit the underlying RICO predicate and of wire fraud.

129.    In connection with the overall scheme to strip ShopKo of its assets and then bankrupt the company, Sun Capital, through its affiliates, caused the Tenant Improvement monies, that were specifically represented to be spent on the developed leasehold "for maintenance, repairs, fixturing, and alterations at the Premises," to be sent directly to Sun Capital for its own profits.

130.    This was done knowingly and fraudulently, understanding that the transfer would deprive ShopKo of assets sufficient to meet its current and anticipated liabilities.

### D.    Injury and Causation.

131.    Plaintiffs have been and will continue to be injured in their business and property due to the violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial.  The injuries directly, proximately, and foreseeably resulted from, and were caused by, the violations of 18 U.S.C. § 1962(c) stated above.  These include, but are not limited to, the millions of dollars paid by Plaintiffs in reliance on the representations concerning Tenant Improvement funds.  The damages are not limited to the Tenant Improvement payments, however, as Plaintiffs are now saddled with ownership of properties that are nearly worthless, and will only be able to be sold, if at all, at salvage value.  Plaintiffs would not have entered into the loan agreements if they had been told the truth, that the Tenant Improvement payments were going to be immediately sent into Sun Capital's coffers.

132.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages plus attorneys' fees and costs.

## SECOND CAUSE OF ACTION
### (Conspiracy to Violate RICO 18 U.S.C. § 1962(d),
### Against all Defendants)

133.     Plaintiffs incorporate by reference, as if set forth fully herein, paragraphs 1 through 132 above.

134.     As stated above, Defendants have unlawfully, fraudulently, and willfully combined, conspired, and agreed with each other, and with the unnamed ShopKo parties, to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d), as described above.

135.     By and through each Defendant's close corroboration with each other, and with ShopKo, which it dominated through installation of its own management team, each Defendant and the dominated entity, ShopKo, knew of the nature and operations of the Enterprise, and knew that it extended beyond each Defendant's individual role. Moreover, each Defendant and unnamed ShopKo conspirators knew that the Enterprise was engaged in a conspiracy to commit predicate acts, including those set forth above, and the predicate acts were part of a pattern of racketeering activity, and each agreed to pursue the same criminal objective.

136.     Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, operation of the Enterprise's affairs through a pattern of racketeering activity in violation s of 18 U.S.C. § 1962(c). In particular, each Defendant was a knowing, willing and active participant in the Enterprise and its affairs, and each Defendant shared a common purpose namely, the orchestration, planning, perpetuation, and execution of a scheme to defraud Plaintiffs, as stated above. In the absence of agreement, the Enterprise could not have operated as it did. Further evidence of an agreement among Defendants is particularly within their control.

137.    The participation and agreement of each Defendant was necessary to allow the commission of this pattern of racketeering activity.

138.    Plaintiffs have been and will continue to be injured in their business and property by reason of Defendants' violations of 18 U.S.C. § 1962 (d) in an amount to be determined at trial. The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, the millions of dollars paid in Tenant Improvements to ShopKo, and in developing the properties for leases that would never have a chance to be developed had Plaintiffs known the true facts; that the Tenant Improvement monies were to be swept directly to the coffers of Sun Capital, either directly, or through its affiliates.  The damages, however, are not limited to just the Tenant Improvement payments.  As the result of the misrepresentations set forth above, Plaintiffs are now saddled with buildings that are virtually worthless and will only be able to be sold, if at all, for salvage value. Had Plaintiffs known the true facts, they would never have entered into the transactions outlined above.

139.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages, plus attorneys' fees and costs, from Defendants.

### THIRD CAUSE OF ACTION
**(Common Law Fraud)**

140.    Plaintiffs incorporate by reference, as if set forth fully herein, paragraphs 1 through 139 above.

141.    As stated above, Defendants caused to be made misrepresentations of material fact in each lease signed with Plaintiffs.  The misrepresentations were that the Tenant Improvement

moneys were necessary, and that those Tenant Improvement monies would be used for "maintenance, repairs, fixturing, and alterations at the Premises."

142.    To buttress this representation when Plaintiffs questioned the amount of the Tenant Improvement allowance, the representatives of Defendants' controlled entity, ShopKo, told Plaintiffs that the ShopKo Hometown rapid expansion was part of an overall strategy to increase the store count, and to then take the company public in an initial public offering, as related above.

143.    Plaintiffs relied upon these representations to develop the properties and enter into the lease agreements.  Had they  known the true facts:  (a) that the Tenant Improvement monies did not stay with the local ShopKo Hometown stores to ensure viability, and that (b) the ShopKo Hometown program was just part of a broader strategy to strip assets from ShopKo by Sun Capital, they never would have entered into the transactions.

144.    Plaintiffs were damaged in an amount to be determined by a jury in that they not only paid to ShopKo Tenant Improvement fees that did not go to the stated purposes; but now, as a result of the broader strategy to strip ShopKo of its assets, they have buildings with no tenants, that cannot be leased at all, or only leased at salvage rates.


## FOURTH CAUSE OF ACTION
### (Unjust Enrichment)

145.    Plaintiffs incorporate by reference, as if set forth fully herein, paragraphs 1 through 144 above.

146.    As a result of the fraudulent and unjust conduct referenced above, Sun Capital and its affiliates have been unjustly enriched.  Defendants' enrichment is comprised of millions of dollars it was able to divert from the local stores for improvements to its own coffers.

147.    Plaintiffs have been unjustly impoverished as the result of Defendants' scheme, and it would be manifestly unjust for Defendants to keep their ill-gotten gains.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.    General and compensatory damages proven at trial.

B.    Treble damages pursuant to 18 U.S.C. § 1964(c).

C.    Punitive damages.

D.    An award of a reasonable attorneys' fee, plus the costs of this action pursuant to 18 U.S.C. § 1964(c).

E.    Prejudgment interest.

F.    Assignment of all sums Sun Capital and its affiliates procured as the result of the scheme set forth herein.

G.    Such other and farther relief as law and/or equity that the Court deems just and proper.

*/s/ Joshua R. Gale*
Joshua R. Gale, Esquire
Florida Bar No.: 63283
WIGGINS CHILDS PANTAZIS
FISHER GOLDFARB LLC
101 N. Woodland Blvd., Suite 600
DeLand, Florida 32720
Telephone: (386) 675-6946
Facsimile: (386) 675-6947
Email:  JGale@wigginschilds.com

Attorney for Plaintiffs

**OF COUNSEL**
Brian M. Clark
WIGGINS CHILDS PANTAZIS,
FISHER GOLDFARB LLC
The Kress Building
301 Nineteenth Street North
Birmingham, Alabama 35203
Telephone: (205) 314-0530
Email:  bclark@wigginschilds.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of November, 2019, I electronically filed the foregoing,

using the Court's CM/ECF system, which will send automatically send email notification of such

filing to all counsel of record.

Robert M. Brochin
Morgan Lewis and Bockius LLP
200 South Biscayne Boulevard, Suite 5300
Miami, Florida 33131-2339

Andrew J. Gallow
Morgan Lewis and Bockius, LLP
One Federal Street
Boston, Massachusetts 02112

  _/s/ Joshua R. Gale_____
OF COUNSEL